Morning, Your Honors. John Coffman representing the Juvenile Male. I thank the Court for inviting you here for oral argument. I welcome Judge Clark. Certainly your appearance makes the Ninth Circuit look a lot better. Let me just begin my argument by addressing Judge Kaczynski's argument here about don't we presume that District Court judges know what they're doing? I'm not just making it up. That's our law. I understand that. But let me anticipate your argument that in this particular case, it's dangerous to presume because you – Just remember, both of my colleagues, right and left – actually, all three of us used to be trial judges, so you better be careful what you say here. I understand. But we have a warm spot in our hearts for trial judges. We might be the trial judge just sit here by somebody else, but just giving them all kinds of protection. I understand that. But presume is very close to assume, and my law professors told me what assume means, if you break it down. And in this case, there's nothing to presume because everything is on the record here. The trial judge tells you exactly what he's thinking when he makes his ruling in this case. Good trial judges do? So what's your beef here? My beef is that when he says he's thinking about something, that means that he's not really sure. It's really quite explicative. There are due process violations. We have certain standards of proof, burdens of proof, burdens of going forward. And this particular trial judge in his rush to judgment in this district court bench trial kind of violated them and prejudiced the juvenile in this case. When a district court judge says, I think – let's take a minute and just try to create what's in the judge's mind because he's putting what his mind is on the record. You can't think when you're talking about proof beyond a reasonable doubt. Proof beyond a reasonable doubt is a firm conviction pursuant to the instruction that's given in Ninth Circuit cases or approved as model Ninth Circuit instructions that you have a firm conviction that there is no reasonable doubt in a case. And when a judge says he thinks, he's challenging whether or not the burden of proof, the government has satisfied the burden of proof in going forward beyond a reasonable doubt. And when the judge tells you that – This is an argument only a lawyer could love. I understand that. I mean, most people say, I think. I mean, this is sort of my belief. It's a throat-clearing device. It's a way of being colloquial. But it certainly does not mean uncertainty or doubt. Belief doesn't cut it in a criminal case. But belief is all you have. There's no certainty. I mean, we can't say that there is no certainty. There's no certainty. When it comes to historical facts, we can never be certain. We can only have beliefs about what happened in the past. But those beliefs have to rise to the level of beyond a reasonable doubt. Okay. So the judge, I, you know, I'm sure knew that. So what is it that should make us doubt? Well, what should make you doubt is his next statement on the record that seems to transfer the burden of proof from the defendant to the – from the government to the defendant on who has to go forward and who has to prove what. When the judge tells you that in order to rule for the defendant, he has to believe the defendant, that's clearly erroneous. Well, but just a minute. He doesn't have to believe the defendant at all. Just a minute. In United States v. Tucker, we upheld a permissible prosecutor's closing argument, which consisted of telling the jury that she wanted to point out a couple of things, and now I'm quoting, that you as jurors are going to have to find to be true if you decide the defendant is not guilty. Because for you to say he's not guilty, there are the things that you have to believe, and this is not logical. Isn't that similar to what the district court said in this particular instance? And therefore, am I not bound by that logic in Tucker? Well, you're talking apples and oranges, Your Honor. One is the argument of an attorney who wants to bring forward things to the jury that may affect credibility. The other one is a position by a judicial officer telling the defendant that I have to believe you in order for me to find for you. Well, but in that instance, why couldn't I say that's just fair commentary on the weak and noncredible nature of the defendant's case? Because the facts in this case don't support that. Well, but why isn't the district court's statement an elliptical way of saying, I find the government's proof persuasive beyond a reasonable doubt, and for me to change my mind on that, I would have to believe defendant's story, which I find implausible? That's the background. He has seen all the evidence, and he says, having seen all the evidence, where I am in my thinking is that for me to have doubt, I'd have to believe the defendant, and I don't. So that's where we are. Why isn't that the most plausible way of reading what the district judge is doing here? Because you read things in the record that are not there. No, but they are there. The fact is the judge sat through the trial. He saw the evidence. He formed his thinking after watching the both sides present their case and said, and then he says, look, after having seen everything, in order for me to find the doubt, I would have to believe the defendant, and I don't. So there's no basis for me to have a doubt, reasonable otherwise. Isn't that the fair way? And isn't that the deference we owe district judges in reviewing? We don't nitpick their statements from the bench. I understand, Your Honor. However, in this case, if you take a look at the facts of this case, there's only one fact in dispute, and that's whether it's possession for use or it's possession with intent to transfer. That's the only issue here of fact that the judge disputes. No other issue is in dispute here. But isn't it a fact that the Ninth Circuit has held that intent to distribute can be inferred from quantity and type of illegal substance? Absolutely. And hasn't the court also said that we can infer the intent to distribute from the manner in which the defendant packaged the marijuana? Absolutely. So in that instance, given my standard of review, how do I undo the district court? Because in this case, it's less than a pound of marijuana. And in this case, the packaging is not done by the defendant. The defendant gets the stuff from Mexico, is driving home from the border in Naco. He says, boy, I'm going to have a big party. How much was it? It was a brick, right? They say a brick. A brick is usually a kilogram, but it's not. It wasn't in this case, I guess. It's less than a pound. There is no finding of exactly how much, but the judge, because it was never weighed, but the judge makes a finding on the record less than a pound. So you're going to do that in this case. That's a lot of marijuana for personal consumption. Well, not if you're going to use it over a year. So like going to Costco and buying a whole case of beans or something, right? It's not, I guess, wholly implausible, but that's why we have ties of fact. And the judge sees the circumstances. He sees that this is a brick. He listens to the defendant's explanation. He doesn't find them credible. And he comes out where he comes out. I mean, it's just one of those things. I understand. Let me just, there's one other thing I want to say on the Fourth Amendment issue. I never won a Fourth Amendment issue before the circuit. It's my dream to win one before I die. However, the judge uses. You might have to wait a little longer. I hope you hold off that. The judge uses a totality of circumstances test in determining whether or not a frisk or a pat-down search is done. That's not the test. The test is, does he have a reasonable belief that the person may be armed or dangerous? The government's position that a Terry test should be automatic in all drug cases has never been held before this Court. Why isn't this frisk a justifiable border search, as the district court indicated, since the search took place at a permanent checkpoint in fairly close proximity to the border? Well, first of all, it's not a border case. The record shows that the checkpoint's 100 miles from the border. Well, I guess you have to determine now whether it's fairly close. But the district court suggested that this was a border search, and that's in the totality of the circumstances. If I look at the border search, they can do all kinds of things at the border. I have that happen to me every time I get on the airplane. A lot worse than what this kid had to have. Yeah, me. I'm big. And this was a kid. But I'm just saying, given what the district court said, I'm having a tough time understanding when it's a justifiable border search. They couldn't do what they did. In this case, the reason is, is that they've already run a dog by these individuals. They've already run a dog through the car. They don't find anything. They've already done a pat-down search of one of the individuals, and they find nothing. And the testimony, the clear testimony before the Court is, oh, it's possible for them to have weapons on them. And that's not the Terry standard. But they're touching themselves on the waist. And, you know, it's easy sitting here in courtroom one in San Francisco to hypothesize about this. But if you're the officer in the field, and you've stopped somebody 100 miles from nowhere, I mean, this was in the middle of a field somewhere, and you've got somebody who's doing this kind of thing, you know, I don't know. If you're an officer, you want to come home and have dinner with your family that night, not wind up in a hospital or dead somewhere. But the problem is... It strikes me as the most reasonable thing in the world when somebody is doing this kind of thing to see what the heck he's reaching for there. Maybe he could be reaching for a gun or a knife or, you know, something really dangerous. There is no testimony that he's reaching for anything. There is testimony that he's fidgeting, nervous, touching his stomach. The officer says that he's touching himself, and that in his experience, people who do that kind of thing often have weapons there. You know, I believe him. I don't know. It just strikes me. Maybe I've seen too many movies, but it just strikes me as eminently plausible that that's where you would keep weapons, and if you're sort of fidgeting and touching it, then maybe you're looking for a way to reach under and make a break for it. I understand that, but there is no bulge. There is no indication that there's a weapon there other than the nervous fidgeting behavior. Thank you. Let me thank the Court for allowing me to go a few minutes over and confirm that these 10 minutes defy the laws of physics. Thank you. Counsel, I know you've worked hard on your outline, but I'd like to talk about the Fourth Amendment. Could I ask you some questions about that? Certainly, Your Honor. Thank you. My understanding from the record is that Officer Cooper testified that at one point that it was the driver, Mendez, who did this, who touched near his waistband. He later testified that the passenger, the juvenile, did that as well. But he didn't put that in his report, right? I believe that is correct, Your Honor. I think the record in this case reflects that he did not put that in his report. Did the trial court make a finding that the juvenile ever touched himself on his waistband or near his waistband? I don't believe that there was a specific finding. And I think the record with respect to the judge's finding on that point is silent. I do not recall from the record. I think that, too, if my memory serves. And Officer San Ramon is the one who did the path down of the juvenile, yes? At the request of Officer Cooper, yes. Right. So my understanding of your theory is that there was reason to pull the car over into the secondary inspection area because the dog alerted. And in addition to it being our theory, it's also conceded by the defendant that there was reason. Right.  So I think we crossed that off the decision tree. And then when you get into the secondary inspection area, the dog alerted again to the car, but not to either of these two young men. That is correct, Your Honor. Right. And then Officer Cooper develops this concern for his personal safety because of the driver's conduct. That was his testimony. What's the justification for frisking the juvenile? The justification for frisking the juvenile, Your Honor, is that Office 8, excuse me, Orbitral Agent Cooper saw this behavior of the touching of the abdomen and the  And that was the testimony from the defendant. And it was the testimony from Agent Cooper. And then at his request, the CBP officer who was on detail from Florida, San Ramon, then conducted the inspection of the defendant. Okay. And he didn't testify. So we don't know what he felt when he patted down the juvenile, right? That is correct, Your Honor. And the trial court made a finding that when Officer Cooper patted down Mr. Mendez, the driver, he didn't find anything the first time. Your Honor, I don't know if the district court made that specific finding. There was some indications in the record that there was a, the search took a period of time and there was some ambiguity with that regard. Well, you might want to take it as a hypothetical because that's the part of the sequence that I'm most interested in. If Officer Cooper had what he needed to want to do a pat-down of the driver and he directed the other officer to please pat down the other individual, the juvenile, and they did those simultaneously, would it make a difference if the pat-down of the driver the first time revealed nothing? Your Honor, I don't think so, because in this instance, I think that the additional finding of the marijuana on Mendez and then perhaps the fact that he didn't touch that area on the defendant where the marijuana was found on Mendez, I don't think that that would be significant. I think at that point they'd be justified to go back and check that area on the defendant. So the hypothetical is they didn't find anything on Mendez the first time they patted him down. So they have to have an independent reason to pat down this juvenile that's not dependent upon my hypothetical, that's not dependent upon finding marijuana on Mendez. That's what I'm asking you to address. I think at that point, I think because of the canine alerts, the contraband as the vehicle entered the primary area, and then based upon the testimony of Agent Cooper about the fidgeting that he saw from the defendant, I think I don't think it's necessary, Your Honor, to have an independent finding of marijuana on Mendez in order to search the defendant in this case, if I understand the Court's hypothetical. Go ahead. Well, you really can't search the defendant simply because he's in close proximity to drug activity, can you? Your Honor, I think that not so. He's got a pat-down search here. Certainly not solely, Your Honor. And it seems to me that the pat-down search is only there if there's some problem about dangerous weapons. I think by in and of itself, Your Honor, I think that that would just the close proximity to narcotics. Close proximity to narcotics will give you that opportunity to pat down? No, Your Honor. I was saying not solely, but in this case. Well, it seems to me. I mean, I read pretty clearly these cases, and it seems to me that you've got to have a suspicion of dangerous weapons rather than just a general engagement in exploratory search for whatever evidence of criminal activity the officers could find. Your Honor, I think the standard that this Court set forth in United States v. Terry Crespo is that in conjunction with a brief investigatory detention under Terry v. Crespo, that there may be a threat to a safety, then a pat-down search is justified. But what is there that says that there was a reasonable threat to any safety here? Didn't both officers testify that the defendant behaved in a compliant and nonthreatening manner? Your Honor, I think that that may have been. That's in ER 18 and 20. Well, Your Honor, I think that I would point out to the Court that this officer also testified that the behavior he saw being exhibited by both Mendez and the defendant indicated to him that there was a potential that this individual was carrying a weapon, and that was the testimony from Agent Cooper, who was in the secondary inspection area. If that's correct, if I credit all of that, what do I do about the fact that Officer San Ramon didn't testify, so we don't know what he felt when he patted down the individual, the juvenile? That's correct, Your Honor. I think that if Officer San Ramon had been the decision-maker, I think that that would cause a problem for the analysis for the Court. But the testimony in this case from Agent Cooper was that that pat-down done on the defendant by Officer San Ramon was done at his request based upon what he saw. Right. And then let's – I understand all of that. And let's say that I agree with you up until that point, and then Officer San Ramon is doing a pat-down. Don't we need his testimony to know what he felt and why he lifted the young man's  hand? Your Honor, I think the fact that Officer Cooper saw this and either passed on that information or just – or simply just had another officer do that, I think that that would be reasonable suspicion and meet the – meet the articulable and reasonable suspicion standard that was set forth by the – Why is that? Why is that? Well, how do we know from Officer Cooper what Officer San Ramon felt when he did the pat-down? Your Honor, I could think of a hypothetical where we have a few officers and several individuals, and maybe that the behavior was seen by only one officer, and so because of the nature and context of the situation, all officers may not have the total knowledge of the circumstances. But I know this Court has held in cases that the knowledge from the different officers who were involved in one investigation can be, to some extent, imputed to others. And I think that in this case, again, there may be problems if there wasn't this request by Officer Cooper to Officer San Ramon. That could be a problem. But in this case, I think that the fact that it was passed on and they were involved in the same investigation, I think, would meet the standard. Well, my worry about this, and I give the district court a lot of credit as to facts. In fact, even on a motion like this, it seems to me the facts are something the district court has to determine. In my view, the district court didn't appear to credit the testimony that the defendant was also fidgeting and touching his hat on. In fact, the court said, and I quote, Officer Cooper's arrest report made at the scene did not include any information on defendant vigil acting nervous or fidgety as observed with Mendez. Accordingly, in the section where the court interpreted the evidence, the court only mentioned nervous behavior and gestures of Mendez, not the defendant. Doesn't this mean that the court did not specifically find any factual findings as to vigil? I mean, I read what he said very carefully, and it doesn't seem to me he was giving any credit to this idea that he was fidgeting. Your Honor, the district court may not have specifically referenced the fidgeting behavior of, well, not only that, but he said the arrest report did not include any information about nervous or fidgety. And then when he starts talking about what is that, what he's interpreting, then he says only nervous behavior and gestures of Mendez. And, of course, Your Honor, the district court in this case found that the search was lawful under the totality of the circumstances. Well, I understand the totality of the circumstances, but I'm worried that we're talking a little bit different here. We're talking about we've got to find something with some dangerous weapons. So I'm looking at what the district court said about dangerous weapons. Well, Your Honor, I also believe that if we have two individuals that are acting the same in a vehicle, and again, I think that to say that you could pat down one but not the other when they're behaving the same, I think it would be unreasonable. Well, I don't know they are behaving the same. The district court is saying they didn't behave the same. It wasn't even included in Officer Cooper's arrest report, and he only mentioned nervous behavior and gestures of Mendez. Your Honor, I guess my answer to that is the district court made its finding under the totality of the circumstances, and I think all the factors they cited, the proximity to the border, the involvement of no other, I think the district court specifically also stated that, gave credit to Officer Cooper's testimony or, excuse me, Agent Cooper's testimony that weapons are often associated with narcotics. Therefore, it wasn't unreasonable for him to conduct a search warrant. Let me ask you one other thing. As I read your stuff, I didn't see one really argument that all this is justifiable as a border search. Your Honor, the ‑‑ I mean, I read through it to find it because I was thinking, oh, there's another border search case. We'll have a lot more to do. But the government didn't even argue it. So have you waived it? No, Your Honor. I don't believe we've waived it. How did you ‑‑ where did you argue it? Well, Your Honor, the ‑‑ You argued in the totality of the circumstances. That's the best I could find. Correct. Which is not a border search. Right, Your Honor. The reason why it wasn't argued is because this particular Border Patrol checkpoint, Mr. Kaufman did point out, is a distance off the border. So it isn't necessary, so we could not worry about that argument? I think it is a factor to be considered in a totality of the circumstances analysis, but it is not a port of entry where it's clear that it is ‑‑ He might have gone to the border and bought it on this side. There's no evidence one way or the other. That's correct, Your Honor. Where he crossed the border. So it's not so much a matter of having waived it. You simply didn't have a foundation for any finding that it was a border search. That's correct, Your Honor. Did the government make that argument before the trial court? The argument before the trial court, Your Honor, was that the search was justified under Terry v. Ohio. The fact is we don't know where he got it. There's no evidence. There's nothing to indicate he crossed the border. He could easily have gotten it from a shop. When I say a shop, I mean an illegal shop on this side. The town spans the border, right? NACO, which is close to the border. NACO spans the border. So you can go to NACO, stay on the U.S. side, buy narcotics, and go inland, right? Yes, Your Honor. There's nothing logging defendant or his confederate here from actually crossing the border, right? That is correct, Your Honor. To be candid with the court, that was the testimony from both Mendez and the defendant was they bought it on the U.S. side in NACO at a driving range. Yeah. But even if we don't believe them, it doesn't matter because there's no ‑‑ There's no evidence that they crossed the border. Yes, Your Honor. So that ‑‑ so your position is that the fact that it's near the border adds the aura of narcotics trafficking because you can buy drugs at the border in large quantities even without crossing it. That's correct. But there's no actual proof of crossing the border, so this is not a border search. That's correct, Your Honor. Okay. Unless the Court has any other questions, I would just simply ask this Court to affirm the district court's judgment. Thank you. Your Honor, may I have 30 seconds to finish? 30 seconds. Okay. I have a minute. How was that? That would be fine. Although the record says that this border checkpoint is 100 miles from the border, that's not quite accurate. It's about 25 or 30 miles from the border. And to say that it's in a rural area from far from any place is also not correct. It's about five miles north of the town of Sierra Vista, which is a military base and has a population of about 40,000 people. But the station itself is in the middle of nowhere in the sense that there's not a lot of traffic around and it's not a lot of people walking around. If somebody wants to make a break for it, they have some chance of getting away. It's not like they'll be running into traffic or there'll be a lot of people to ‑‑ That would not be correct, Your Honor. It's a four-lane highway, two lanes going both ways. There's a ton of traffic going to and from Fort Huachuca is the military base there. It's about 10 miles further north is the town of Benson and a hookup to I‑10, which is an interstate that ends up in Los Angeles and begins somewhere in Florida. So I just wanted to clarify those areas. Thank you very much for that opportunity. All right. Thank you. Occasions are your assessment. We are adjourned.
judges: Kozinski, Kozinski, Smith, Smith, Christen, Christen